In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 20-2940

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWARD B. BURGESS, JR.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:19-cr-00042-JPS-1 — **J. P. Stadtmueller**, *Judge.*

_____

ARGUED SEPTEMBER 29, 2021 — DECIDED JANUARY 6, 2022

_____

Before EASTERBROOK, RIPPLE, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Edward B. Burgess burned down the apartment he shared with his girlfriend on December 7, 2018. While on the run from police, Burgess robbed a Metro PCS store at gunpoint. At sentencing, the district court applied a 2-level adjustment for obstruction of justice under U.S.S.G. § 3C1.1. The court based the adjustment on Burgess's perjurious testimony at his suppression hearing and on his violations of a no-contact order prohibiting communi-

cation with his girlfriend. On appeal, Burgess contends the factual findings at sentencing did not support either basis for the § 3C1.1 adjustment.

We find the district court did not plainly err in applying the § 3C1.1 adjustment. The factual findings upon which the district court relied establish by a preponderance of the evidence that Burgess's violations of the no-contact order amounted to obstruction. Accordingly, we affirm.

## I. Background

### A. Criminal Activity and Arrest

Appellant Edward B. Burgess had a domestic dispute with Titierra Howard, his girlfriend, on December 7, 2018. Burgess left their shared apartment but continued to text Howard, threatening to kill her and burn down the apartment. Later that night, Burgess set a fire that destroyed the building and all of Howard's and her children's belongings (including those of Burgess's son with Howard), rendering them homeless. Fortunately, neither Howard nor her children were harmed.

Burgess fled and eluded law enforcement for a little over four months, during which he committed another crime. On April 15, 2019, Burgess walked into a Metro PCS store and instructed the clerk to open the register. When the clerk refused, Burgess displayed a semi-automatic handgun, told the clerk he was not "playing," and advised the clerk not to "do anything." The clerk opened the register and Burgess stole $650.

At this point, Burgess's luck ran out. The Metro PCS he robbed had a security camera which allowed a citizen to identify Burgess and tip off the Milwaukee Police Depart-

ment ("MPD"). On April 19, 2019, executing an arrest warrant based on the citizen tip, MPD arrested Burgess at his sister's house and recovered a handgun and the clothing Burgess wore during the Metro PCS robbery. The government indicted Burgess on four counts arising out of the December 7, 2018, arson and the April 15, 2019, robbery: arson (Count I), being a felon in possession of a firearm (Count II), Hobbs Act robbery[1] (Count III), and use of a firearm during a robbery (Count IV).

Soon after arresting Burgess, the government moved for an emergency no-contact order between Burgess and Howard. The government presented evidence Burgess had contacted Howard extensively while in custody, discouraging her from cooperating with law enforcement and encouraging her to change her account of the events on December 7, 2018. A magistrate judge granted the government's motion and entered a no-contact order on May 14, 2019. Despite numerous reminders to abide by the order, Burgess consistently and repeatedly contacted Howard.

**B. Suppression Hearing**

Burgess moved to suppress evidence obtained during his arrest, arguing MPD lacked probable cause to believe he was inside his sister's house at the time. Burgess indicated he might call Howard to testify as a witness on his behalf. In the month leading up to the suppression hearing, Burgess contacted Howard numerous times over the phone despite the no-contact order. The magistrate judge held a suppression

---

[1] The Hobbs Act makes it a federal crime to commit, or attempt to commit, robbery in a way that affects interstate commerce. 18 U.S.C. § 1951.

hearing on August 2, 2019. The crucial issue at the suppression hearing was whether, as officers represented, Burgess exited his sister's house to take out the garbage the day of his arrest.

The government presented the testimony of Officer Michael Lopez, tasked with conducting undercover surveillance on Burgess's sister's house the morning of Burgess's arrest. Lopez believed Burgess was in the home because Burgess's phone was "pinging" from that location. Lopez, who studied a booking photo and physical description of Burgess prior to initiating surveillance, testified he saw Burgess exit his sister's house carrying trash bags, place the bags in garbage cans, and walk to the back yard. Lopez was confident Burgess reentered his sister's house after taking out the garbage because he knew the house had a side door and none of the other officers surveilling the house saw Burgess leave the property. The government offered a contemporaneous audio recording of the radio transmissions between Lopez and his fellow officers which corroborated Lopez's testimony.

Burgess testified on his own behalf, claiming he was "100 percent sure" he "never" exited his sister's house the morning of April 19, 2019, prior to his arrest. Burgess also confirmed he heard Lopez's testimony to the contrary but insisted several times Lopez was incorrect. Burgess confirmed he understood that, on his motion to suppress, he was arguing evidence should be suppressed because MPD lacked probable cause to enter his sister's house. Burgess verified he understood that, if the magistrate judge credited his account of events, the evidence might be suppressed, which would strengthen his defense.

The magistrate judge recommended denying Burgess's motion to suppress. The magistrate judge found Lopez's testimony more credible given the corroboration of the contemporaneous audio recording and Burgess's strong motivation to lie. The district court adopted the facts in the magistrate judge's report, accepted the magistrate judge's recommendation, and denied the motion to suppress. The district court agreed Burgess's testimony was less credible than Lopez's as Lopez had far less motive to lie and Burgess "admit[ed] to attempting to influence his girlfriend to give false testimony," which impacted his credibility.

**C. Sentencing**

On the eve of trial, Burgess pled guilty without a plea agreement to Count III (Hobbs Act robbery) and Count IV (use of a firearm during a robbery).[2] The Probation Office prepared a presentence investigation report ("PSR") that recommended a 2-level enhancement of Burgess's offense level under U.S.S.G. § 3C1.1. Section 3C1.1 recommends a 2-level offense level increase where:

> (1) [T]he defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and

---

[2] Burgess previously pleaded guilty to Count I (arson) pursuant to a plea agreement with the government in exchange for dismissing Count II (being a felon in possession of a firearm).

> (2) the obstructive conduct related to (A) the
> defendant's offense of conviction and any rele-
> vant conduct; or (B) a closely related offense[.]

U.S.S.G. § 3C1.1. The PSR included two bases for the en-
hancement. First, Burgess committed perjury by "testif[ying]
falsely at an evidentiary hearing … asserting under oath that
he never left a residence when contemporaneous record evi-
dence proved otherwise[.]" Second, Burgess "repeatedly vio-
lated the Court's no-contact order, which prohibited Mr.
Burgess from contacting Ms. Howard from jail … most often
during the month of July 2019, which is when his motion to
suppress, in support of which he claimed Ms. Howard might
be a witness, was pending."

The PSR contains limited context surrounding the per-
jury or violations of the no-contact order supporting the
§ 3C1.1 adjustment. As to perjury, the PSR does not indicate
Burgess made the statement at a suppression hearing, how
his statement related to a material issue of the hearing, the
source of the MPD's probable cause, the timing of Burgess's
testimony in relation to Lopez's, how frequently Burgess of-
fered the false testimony, or Burgess's motivation to lie. As
to violations of the no-contact order, while the PSR contains
records of text and Facebook messages between Burgess and
Howard from December 7, 2018, through January 5, 2019, it
does not include similar descriptions of or records for the
period after May 14, 2019, when the no-contact order went
into effect.

Applying the 2-level § 3C1.1 adjustment, the Probation
Office calculated a total offense level of 28 and a criminal
history category of III for Burgess. This yielded a guidelines
range of 97 to 121 months' imprisonment.

The district court sentenced Burgess, who appeared *pro se*, on October 1, 2020. Burgess confirmed he had an adequate opportunity to review the PSR and, when asked whether he wished to raise "additional matters that have not been addressed in the [PSR]," inquired only after four pending motions: a motion to withdraw his guilty plea, a motion to dismiss, and two motions for reconsideration. The district court orally denied each pending motion. Turning to the PSR's recommended sentencing guidelines and calculation, the district court confirmed Burgess had no objections. The district court adopted the PSR's guidelines and calculations. In the "Court Findings on Presentence Investigation Report" section of the subsequent statement of reasons, the district court "adopt[ed] the revised presentence investigation report," in effect adopting the PSR's factual findings as its own.

At sentencing, Burgess sought the mandatory minimum sentence while the government requested a total of 205 months' imprisonment (121 months for Counts I and III and the mandatory 84 months for Count IV). The government highlighted Burgess's escalating behavior, the devastating nature of his crimes, and his attempts to influence and threaten Howard. Burgess challenged the government's characterization of his communications with Howard. When issuing the sentence, the district court noted the severity of Burgess's crimes and the sheer fortuity nobody was injured or killed. Weighed against the 18 U.S.C. § 3553(a) factors, the district court sentenced Burgess to a within-guideline term of 90 months' imprisonment for Counts I and III and 84 months' imprisonment for Count IV for a total of 174 months' imprisonment.

Burgess timely filed the present appeal challenging his sentence the very next day.

## II. Discussion

Burgess raises a single issue on appeal: whether the district court properly applied the § 3C1.1 adjustment to Count III.

### A. Forfeiture

Before addressing the substantive issue on appeal, we must resolve a dispute over the applicable standard of review. Typically, we review questions of law, such as whether a district court procedurally erred at sentencing, de novo. *United States v. Beltran-Leon*, 9 F.4th 485, 491 (7th Cir. 2021). More deference is due, however, where an appellant fails to properly raise a claim below. *United States v. Oliver*, 873 F.3d 601, 607 (7th Cir. 2017) (quoting *United States v. Seals*, 813 F.3d 1038, 1044 (7th Cir. 2016)).

Waiver is the "intentional relinquishment of a known right" by a defendant and precludes our review. *United States v. Clark*, 935 F.3d 558, 569 (7th Cir. 2019); *see also United States v. Brodie*, 507 F.3d 527, 530 (7th Cir. 2007). Forfeiture occurs when a defendant "negligently fails to assert a right in a timely fashion" and results in plain error review. *Clark*, 935 F.3d at 569; *United States v. Young*, 908 F.3d 241, 246 (7th Cir. 2018). The essential distinction between the two is whether the defendant "'chose, as a matter of strategy, not to present [the] argument'" before the district court. *United States v. Hathaway*, 882 F.3d 638, 641 (7th Cir. 2018) (quoting *United States v. Garcia*, 580 F.3d 528, 541 (7th Cir. 2009)). We are "'cautious about interpreting a defendant's behavior as an intentional relinquishment'" and construe waiver princi-

ples liberally in favor of the defendant. *United States v. Hammond*, 996 F.3d 374, 399 (7th Cir. 2021) (quoting *United States v. Barnes*, 883 F.3d 955, 957 (7th Cir. 2018)).

Burgess did not raise the present issue—the propriety of the § 3C1.1 adjustment—before the district court at sentencing. The government would have us construe Burgess's silence as waiver. According to the government, Burgess's failure to object was a strategic attempt to avoid undermining his acceptance of responsibility. Combined with Burgess's confirmation he had no objection to the PSR and his demonstrated willingness to object elsewhere at sentencing, the government casts his failure to challenge the § 3C1.1 adjustment as an affirmative decision rather than a negligent omission.

No evidence in the record suggests Burgess strategically opted not to object to the § 3C1.1 adjustment. While Burgess submitted a statement accepting responsibility for Count I, he did not provide any such statement as to Count III or Count IV. In a March 18, 2020, letter to the Probation Office, the government strenuously objected to any reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Ultimately, the guideline calculation in the PSR did not include any such reduction. At sentencing, Burgess did not object to the guidelines calculations or request a downward adjustment to his offense level for acceptance of responsibility. We are curious, then, what advantage Burgess preserved by failing to object to the § 3C1.1 adjustment. Even if Burgess hoped for an acceptance adjustment under § 3E1.1, absent "extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply," "[c]onduct resulting in an enhancement under § 3C1.1 … ordinarily indicates that the

defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, cmt. n.4; *see also United States v. Nichols*, 847 F.3d 851, 859 (7th Cir. 2017). Objecting to the § 3C1.1 adjustment, then, would appear to increase the likelihood of Burgess receiving favorable credit for accepting responsibility. Finally, we are uncertain how challenging the obstruction enhancement—based on perjury or violation of a no-contact order—and acknowledging responsibility for the underlying conduct (arson, Hobbs Act robbery, and using a firearm during a robbery) are mutually exclusive in this particular case. Nor do Burgess's actions at sentencing—where, it bears repeating, he represented himself *pro se*—evince "intentional relinquishment" of an objection to the § 3C1.1 adjustment. Absent a strategic reason to do so, we have required "something more than just a defendant's failure to object to some part of the PSR to find that the defendant waived an argument on appeal." *Hammond*, 996 F.3d at 399.

Instead, Burgess "negligently fail[ed]" to object to the § 3C1.1 adjustment in a "timely fashion" at sentencing. *Clark*, 935 F.3d at 569. We review the district court's application of the § 3C1.1 adjustment for plain error. Remand for resentencing is appropriate on plain-error review where "(1) there was an error; (2) the error was plain; (3) the error affected the substantial rights of the defendant; and (4) the error seriously impacted the fairness, integrity, or public reputation of the proceedings." *Id*. at 569–70.

## B. Obstruction of Justice

The PSR offered two bases for the § 3C1.1 adjustment on Count III: first, Burgess's perjurious testimony at the suppression hearing; second, Burgess's violation of the no-contact order. Either may support a § 3C1.1 adjustment. *See*

*United States v. Law*, 990 F.3d 1058, 1065–66 (7th Cir. 2021); *United States v. Strode*, 552 F.3d 630, 634–35 (7th Cir. 2009). The government bears the burden of proving a § 3C1.1 adjustment is warranted by a preponderance of the evidence. *United States v. Brown*, 843 F.3d 738, 742 (7th Cir. 2016). Obstruction under § 3C1.1 includes "threatening, intimidating, or otherwise unlawfully influencing a … witness … , directly or indirectly, or attempting to do so[.]" U.S.S.G. § 3C1.1 cmt. n.4(a); *see also Strode*, 552 F.3d at 634. The government met its burden, and the district court properly applied the § 3C1.1 adjustment as to the no-contact order. Therefore, we need not analyze perjury as a basis for the adjustment. *See, e.g., United States v. Nurek*, 578 F.3d 618, 622 n.1 (7th Cir. 2009).

Where, as here, "a defendant does not object to the enhancement at the time of sentencing," the district court need not make "independent findings on the record" and may, instead, adopt the findings of the PSR. *United States v. Galbraith*, 200 F.3d 1006, 1013 (7th Cir. 2000) (citing Fed. R. Crim. P. 32(b)(6)(D) ("Except for any unresolved objection … the court may, at the [sentencing] hearing, accept the presentence report as its findings of fact.")). By adopting the PSR in its statement of reasons, the district court adopted the PSR's factual findings as its own. *See United States v. Long*, 639 F.3d 293, 300 (7th Cir. 2011); *United States v. Salem*, 597 F.3d 877, 888 (7th Cir. 2010). While the parties agree the district court relied upon the factual findings in the PSR at sentencing, the government suggests the district court also looked to the sentencing memorandum. This is unsupported by the record. Although the government "directed" the district court to its sentencing memorandum, nothing in the sentencing transcript indicates the district court relied upon or referenced the sentencing memorandum when evaluating the

§ 3C1.1 adjustment. The factual basis for the § 3C1.1 adjust-
ment, then, is limited to the district court's findings at the
sentencing hearing and those contained within the PSR.

The district court did not make independent findings re-
garding Burgess's violation of the no-contact order. The
PSR's factual predicate supporting the § 3C1.1 adjustment,
reproduced in its entirety below, is sparse:

> [Burgess] repeatedly violated the Court's no-
> contact order, which prohibited Mr. Burgess
> from contacting Ms. Howard from jail. Nota-
> bly, Mr. Burgess violated the no-contact order
> most often during the month of July 2019,
> which is when his motion to suppress, in sup-
> port of which he claimed Ms. Howard might
> be a witness, was pending.

Notably absent from the PSR is any context or detail illumi-
nating the nature or substance of Burgess's violations after
the district court entered the no-contact order. Such context,
however, would have been helpful in evaluating whether
Burgess's violative communications were "threatening, in-
timidating, or otherwise unlawfully influencing." U.S.S.G.
§ 3C1.1 cmt. n.4(a).

The PSR does offer significant detail about communica-
tions between Burgess and Howard before the no-contact
order went into effect. According to the PSR, Burgess "re-
peatedly oscillated between threatening Ms. Howard, ex-
pressing his love and devotion to her, and begging her for
help in obstructing law enforcement[.]" Illustrative text and
Facebook messages are attached to the PSR. For example, on
Christmas Day in 2018, Burgess sent Howard a picture of

himself pointing a gun at the camera. On December 30, 2018, Burgess messaged Howard that she "make[s him] fuckin snap" because she was "tryna get [him] locked up[.]" At other points, Burgess discourages Howard from communicating with law enforcement and asks her to alter her story. Specifically, Burgess instructed Howard to tell police she had not spoken with Burgess and asked her to "switch [her] story up." In early January 2019, Burgess expressly instructed Howard not to speak with police. Burgess told Howard that, if police came to her home, she should pretend she was not there and refuse to open the door.

In total, these facts support a § 3C1.1 adjustment based on Burgess's violation of the no-contact order by a preponderance of the evidence. Burgess's pre-order communications with Howard were replete with threats and discouragements from cooperating with law enforcement. The PSR established Burgess continued to communicate with Howard even after the no-contact order took effect. The majority of Burgess's post-order communications with Howard occurred during the month leading up to his suppression hearing, at which Burgess intended to call Howard as a witness. Evaluated holistically, these facts strongly support the inference that Burgess continued his campaign to improperly influence and intimidate Howard after the district court forbade any contact between the two. The district court did not plainly err in applying the § 3C1.1 adjustment to Count III based on Burgess's violations of the no-contact order. Consequently, we need not address perjury.

This case underscores the importance of verifying the factual basis for guidelines calculations and adjustments. Each component element of the adjustment must be supported by

an appropriate factual finding. If the PSR is deficient or lacking in any respect, the district court must itself make the necessary findings or decline to apply the adjustment.

### III. Conclusion

The district court did not plainly err in applying the § 3C1.1 adjustment based on Burgess's violations of the no-contact order. Accordingly, we AFFIRM.